[Cite as *State v. Armstead*, 2015-Ohio-5010.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellant | : | C.A. CASE NO. 26640 |
| | : | |
| v. | : | T.C. NO. 14CR4210 |
| | : | |
| GLEN D. ARMSTEAD, JR. | : | (Criminal appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellee | : | |
| | : | |

. . . . . . . . . .

**O P I N I O N**

Rendered on the ___4th___ day of ____December____, 2015.

. . . . . . . . . .

CHRISTINA E. MAHY, Atty, Reg. No. 0092671, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
         Attorney for Plaintiff-Appellant

TINA M. McFALL, Atty. Reg. No. 0082586, Assistant Public Defender, 117 S. Main Street, Suite 400, Dayton, Ohio 45422
         Attorney for Defendant-Appellee

. . . . . . . . . . . .

DONOVAN, J.

{¶ 1} Plaintiff-appellant State of Ohio appeals a decision of the Montgomery County Court of Common Pleas, Criminal Division, sustaining the motion to suppress of defendant-appellee Glen D. Armstead, Jr. The trial court issued its decision sustaining Armstead's motion to suppress on March 26, 2015. The State filed a timely notice of

appeal with this Court on March 30, 2015.

{¶ 2} The incident which forms the basis of the instant appeal occurred around noon on January 13, 2014, when Dayton Police Detective Dustin J. Phillips and his partner, Officer Jason Rhodes, were part of a task force which patrolled on the west side of Dayton, Ohio, specifically including properties owned by Greater Dayton Premier Management (GDPM). Det. Phillips and his partner were in a marked police cruiser, and both men were wearing the uniform of the day.

{¶ 3} Upon observing a vehicle fail to signal a turn, Det. Phillips and his partner stopped the vehicle behind a store located behind the northwest corner of West Third Street and James H. McGee Boulevard. After stopping the vehicle, the officers observed that it contained only two individuals, the driver and a passenger in the front seat. While Officer Rhodes spoke with the driver, Det. Phillips made contact with a male sitting in the front passenger seat of the vehicle. Det. Phillips obtained the passenger's identification card and checked his information on the computer located in the police cruiser. The passenger, identified as the defendant, Armstead, did not have any warrants for his arrest. Det. Phillips' computer check, however, established that Armstead was the subject of a valid "suspect locator hit."

{¶ 4} Det. Phillips testified that a "suspect locator hit" informs an investigating officer that another detective wants to speak with the suspect regarding another case. The particular suspect locator hit discovered by Det. Phillips indicated that Detective Jonathan Seiter wanted a sample of Armstead's DNA.

{¶ 5} After receiving the information regarding the suspect locator hit, Det. Phillips directed Armstead to exit the vehicle. Armstead complied with Det. Phillips' request and

got out of the vehicle. Det. Phillips testified that he detected the strong odor of burnt marijuana when Armstead got out of the vehicle. Det. Phillips conducted a *Terry* pat down of Armstead, but did not find any weapons or contraband on or about his person. Det. Phillips did not draw his weapon nor did he handcuff Armstead.

{¶ 6} Det. Phillips testified that at this point, Armstead was free to go, but Armstead was not informed of this fact. Det. Phillips informed Armstead that he needed to come with him in order to speak with another detective at police headquarters. Det. Phillips then placed Armstead in the rear of his locked police cruiser and attempted to contact Det. Seiter.[1] Det. Phillips testified that Armstead was not under arrest at this time, nor did he have probable cause to request an arrest warrant for Armstead. Significantly, Det. Phillips acknowledged that had Armstead refused to go to the Safety Building, he could not have compelled him to do so. Nevertheless, he was already in custody in a locked cruiser. No evidence was adduced that Armstead consented to Det. Phillips' request to go to the Safety Building to speak with Det. Seiter. Additionally, Det. Phillips testified that he was not aware of the reason why Det. Seiter wanted to speak with Armstead, beyond a request for a DNA sample.

{¶ 7} Det. Phillips subsequently informed Det. Seiter that he had Armstead in custody and would be transporting him to the Safety Building for questioning. Det. Seiter thereafter went to a judge in order to get a warrant to collect Armstead's DNA.

**Det. Seiter's Investigation/Basis for "Suspect Locator Hit"**

{¶ 8} In December of 2012, Det. Seiter was assigned to investigate a "hit and run."

---

[1] While Armstead waited in the rear of the locked police cruiser and Det. Phillips tried to contact Det. Seiter, the driver of the vehicle that had originally been stopped fled the scene.

At the site of the incident, police discovered an automobile they believed to be involved in the offense. The vehicle was found to be registered to a female. However, inside the vehicle, police found mail bearing Armstead's name and address. Moreover, Det. Seiter testified at the suppression hearing that the police had received an anonymous tip that Armstead was the driver of the vehicle involved in the "hit and run."

{¶ 9} Det. Seiter testified that he traveled to the address listed on Armstead's mail which was found in the involved vehicle in 2012. Det. Seiter testified that he tried to locate Armstead at the listed address for questioning, but he did not attempt to obtain an arrest warrant. Det. Seiter was unable to locate Armstead at the time of the initial investigation into the "hit and run." Det. Seiter, therefore, placed a "suspect locator hit" on Armstead's file that was later found and acted upon by Det. Phillips.

### Subsequent Questioning at the Safety Building

{¶ 10} Upon arriving at the Safety Building, Det. Phillips and Officer Rhodes escorted Armstead to an interview room on the second floor. Once Armstead was placed in the interview room, Det. Phillips and Officer Rhodes waited just outside the door, never leaving him unattended. Shortly thereafter, Det. Seiter, accompanied by Det. Donaldson, entered the interview room in order to speak with Armstead. Det. Phillips and Officer Rhodes remained outside the room for the entire duration of the questioning. At no point was Armstead informed that he was free to leave.

{¶ 11} Prior to asking any questions, Det. Seiter testified that he had Armstead read his *Miranda* rights and put his initials next to each right. After reading his waiver of rights, Armstead asked to speak to an attorney. Det. Seiter permitted Armstead to place a call on his own cell phone. After Armstead appeared to end his cell phone

conversation, Det. Seiter reentered the interview room and asked him "What are we going to do?" Armstead indicated to Det. Seiter that he was willing to talk. Armstead signed a pre-interview form, and Det. Seiter began asking questions. After approximately five questions asked by Det. Seiter, Armstead indicated that he wanted to stop the interview. Det. Seiter ended the interview, and Det. Phillips drove Armstead to the bus stop hub in downtown Dayton, Ohio.

{¶ 12} On January 21, 2015, Armstead was indicted for one count of failure to stop after an accident where said accident resulted in serious harm or death to a person, in violation of R.C. 4549.02(A), a felony of the fifth degree. At his arraignment on February 3, 2015, Armstead stood mute, and the trial court entered a plea of not guilty on his behalf.

{¶ 13} On February 10, 2015, Armstead filed a motion to suppress the statement he made to Det. Seiter during the interview held on January 13, 2015, regarding his involvement in a hit and run which occurred on December 18, 2012. In his motion, Armstead alleged that his statements were obtained in violation of his constitutional rights. Armstead specifically argued that his statements were made as a result of an unlawful arrest in violation of his Fourth Amendment right against unlawful search and seizure.

{¶ 14} A hearing was held on Armstead's motion to suppress on March 23, 2015. Thereafter, on March 26, 2015, the trial court issued a decision sustaining Armstead's motion to suppress. The trial court found that Armstead's statements were derived from an illegal seizure in derogation of his Fourth Amendment rights. Specifically, the trial court made the following conclusions of law:

*** The Defendant was detained without an arrest warrant having been obtained by the police. The Defendant was taken in for questioning without

being advised that he was free to go. [The Defendant] did not, by act of free will, choose to go downtown for a meeting with the Detective. There was a seizure here and this seizure was in violation of the Fourth Amendment. The statements must be excluded.

{¶ 15} It is from this judgment that the State now appeals.

{¶ 16} The State's sole assignment of error is as follows:

{¶ 17} "THE TRIAL COURT ERRED IN GRANTING ARMSTEAD'S MOTION TO SUPPRESS."

{¶ 18} In its sole assignment, the State contends that the trial court erred when it sustained Armstead's motion to suppress. Initially, the State argues that Armstead's interaction with the police immediately following the traffic stop was consensual. The State also asserts that even if Armstead was arrested, the warrantless arrest occurred in a public place and was supported by probable cause. Therefore, the State asserts that Armstead's Fourth Amendment rights were not violated. The State further argues that if Armstead was arrested, the arrest did not violate R.C. 2935.04. However, if a violation of R.C. 2935.04 did occur, the State argues that the exclusionary rule does not apply, and Armstead's subsequent statements to Det. Seiter should not have been suppressed. Lastly, the State contends that even if Armstead was unlawfully arrested, his statements made to Det. Seiter were "attenuated from the initial arrest, and several intervening acts *** purged the taint of the initial arrest."

{¶ 19} As this Court has previously noted:

"Appellate courts give great deference to the factual findings of the trier of facts. (Internal citations omitted). At a suppression hearing, the trial court serves as the

trier of fact, and must judge the credibility of witnesses and the weight of the evidence. (Internal citations omitted). The trial court is in the best position to resolve questions of fact and evaluate witness credibility. (Internal citations omitted). In reviewing a trial court's decision on a motion to suppress, an appellate court accepts the trial court's factual findings, relies on the trial court's ability to assess the credibility of witnesses, and independently determines whether the trial court applied the proper legal standard to the facts as found. (Internal citations omitted). An appellate court is bound to accept the trial court's factual findings as long as they are supported by competent, credible evidence." *State v. Hurt,* Montgomery App. No. 21009, 2006–Ohio–990.

*State v. Purser,* 2d Dist. Greene No.2006 CA 14, 2007–Ohio–192, ¶ 11.

{¶ 20} Initially, we note that the only witnesses who testified at the hearing held on Armstead's motion to suppress were Det. Phillips and Det. Seiter. The trial court found their testimony to be credible and adopted it as its factual findings.

{¶ 21} The Fourth Amendment prohibits warrantless searches and seizures, rendering them per se unreasonable unless an exception applies. *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *State v. Cosby,* 177 Ohio App.3d 670, 2008-Ohio-3862, 895 N.E.2d 868, ¶ 16 (2d Dist.). Exigent circumstances are a well-established exception to the Fourth Amendment's warrant requirement. *State v. Andrews,* 177 Ohio App.3d 593, 2008-Ohio-3993, 895 N.E.2d 585, ¶ 23 (11th Dist.); *State v. Berry,* 167 Ohio App.3d 206, 2006-Ohio-3035, 854 N.E.2d 558, ¶ 12 (2d Dist.). The scope of this exception is strictly circumscribed by the exigencies that justify the search or seizure, and the police "bear a heavy burden when attempting to demonstrate an

urgent need that might justify warrantless searches or arrests." *Welsh v. Wisconsin*, 466 U.S. 740, 750, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984).

{¶ 22} The Supreme Court of Ohio has recognized that a warrantless arrest that is based upon probable cause and occurs in a public place does not, in general, violate the Fourth Amendment. *State v. Brown,* 115 Ohio St.3d 55, 2007-Ohio-4837, 873 N.E.2d 858, ¶ 66, citing *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). *See also Maryland v. Pringle*, 540 U.S. 366, 370, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003). Additionally, R.C. 2935.04 explicitly permits warrantless arrests for felonies. *See Brown* at ¶ 66. R.C. 2935.04 provides as follows:

> When a felony has been committed, or there is reasonable ground to believe that a felony has been committed, any person without a warrant may arrest another whom he has reasonable cause to believe is guilty of the offense, and detain him until a warrant can be obtained.

{¶ 23} "A reasonably prudent person must, at the time of arrest, believe that the person placed under arrest was committing or had committed a criminal offense." *Brown* at ¶ 66, citing *Gerstein v. Pugh*, 420 U.S. 103, 111–112, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975). "Probable cause to arrest depends 'upon whether, at the moment the arrest was made * * * the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.' " *Adams v. Williams*, 407 U.S. 143, 148, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), citing *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). The existence of probable cause is determined by looking at the totality of the circumstances. *See Illinois v. Gates*, 462

U.S. 213, 230–232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

{¶ 24} As previously noted, after Armstead provided his identification information, Det. Phillips became aware that he was the subject of a "suspect locator hit." Regarding the nature of a "suspect locator hit," Det. Phillips provided the following testimony:

> If the person has a warrant, obviously I will remove them. *However, with something like a suspect locator hit, it is a voluntary compliance type contact.* I've had people refuse to come with me for questioning in different types of cases and *at that point I cannot do anything about it. I can't physically remove them and make them go with me.*

March 23, 2015 Transcript of Proceedings, p. 11 (emphasis added).

{¶ 25} Nevertheless, once Det. Phillips became aware of the "suspect locator hit," he immediately removed Armstead from the stopped vehicle, patted him down, and placed him in the back seat of a locked police cruiser. The record contains no evidence that Armstead agreed to meet with Det. Seiter, nor that he consented to being transported to the Safety Building. Moreover, Det. Phillips did not testify that Armstead initially agreed to speak with Det. Seiter. Det. Phillips did not inform Armstead that he was under arrest or that he was free to leave. Det. Phillips made no attempt to explain to Armstead what a "suspect locator hit" was. Det. Phillips only told Armstead that a detective wanted to speak with him, placed him in a locked cruiser, and took him to the Safety Building for questioning. In our view, this is the functional equivalent of a formal arrest as a reasonable person in Armstead's position would have understood that he was in custody and not free to leave. *State v. Cross*, 2d Dist. Montgomery No. 25838, 2014-Ohio-1534, ¶ 13. Moreover, to perform such a seizure, the police must have probable cause, which

was clearly not present in this case. *State v. Taylor*, 106 Ohio App.3d 741, 749, 667 N.E.2d 60 (2d Dist.1995).

{¶ 26} Armstead was never informed that his compliance with Det. Phillips' requests was completely voluntary. Furthermore, Armstead was not the subject of any outstanding warrants, and Det. Phillips testified that he had no probable cause to arrest him. The fact that the trial court found that Det. Seiter had probable cause in 2012 to obtain an arrest warrant for Armstead is irrelevant to the probable cause analysis we must make as result of Det. Phillips' actions. Det. Phillips admitted he only knew a DNA swab was needed, he knew nothing of the alleged crime or why Det. Seiter desired to talk with Armstead. We also note that Armstead's continued detention was in no way related to the purpose of the original stop of the driver.

{¶ 27} Accordingly, we find that the record establishes that Armstead was illegally detained by Det. Phillips without probable cause and without a warrant. No exigent circumstances were established either. We conclude, as did the trial court, that the totality of the circumstances establish that the State failed to demonstrate that Armstead voluntarily agreed to being transported to the police station in police custody for questioning. This illegal detention was the functional equivalent of an arrest without probable cause or a warrant, thus it was unlawful. Armstead's purported acquiescence to Det. Phillips' request to travel downtown to speak with Det. Seiter amounted to nothing more than a "mere submission to a claim of lawful authority." *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

{¶ 28} Additionally, we find that although Det. Seiter advised Armstead of his *Miranda* rights before he made allegedly incriminating statements, *Miranda* warnings

alone will not necessarily purge the taint of an unlawful seizure. *Brown v. Illinois*, 422 U.S. 590, 603–604, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). For incriminating statements to be admissible, they must be " 'an act of free will [sufficient] to purge the primary taint of the unlawful invasion.' " *Kaupp v. Texas*, 538 U.S. 626, 632–633, 123 S.Ct. 1843, 155 L.Ed.2d 814 (2003), quoting *Wong Sun v. United States*, 371 U.S. 471, 486, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

**{¶ 29}** In the present case, Armstead made his incriminating statements after being illegally detained without probable cause or a warrant and transported to the Safety Building. The State has failed to establish that the taint of the unlawful seizure had dissipated when Armstead made his statements. *See Brown,* 422 U.S. at 604, 95 S.Ct. 2254, 45 L.Ed.2d 416. Therefore, we conclude that the statements were derivative of his illegal detainment and were properly suppressed by the trial court. *See State v. Byrd*, 185 Ohio App.3d 30, 2009-Ohio-5606, 923 N.E.2d 121 (2d Dist.)

**{¶ 30}** The State's sole assignment of error is overruled.

**{¶ 31}** The State's sole assignment of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . .

FROELICH, P.J., concurs in judgment only.

WELBAUM, J., dissenting.

**{¶ 32}** I very respectfully dissent and would reverse the judgment of the trial court. Armstead was not illegally arrested, and his statement, therefore, was not contaminated. Even if Armstead had been illegally arrested, the chain of events between the alleged illegal arrest and his subsequent statements was broken. And finally, Armstead's

statements to the police were voluntary. Accordingly, the motion to suppress should have been overruled.

### A. The Detention and Probable Cause

**{¶ 33}** On January 13, 2014, Dayton Police Officers Phillips and Rhodes stopped a car for a traffic violation. Armstead was riding as a passenger in the car. March 23, 2015 Transcript of Proceedings, pp. 6-7, and 13. Officer Phillips detected a strong odor of marijuana from within the vehicle. *Id.* at pp. 9-10.

**{¶ 34}** When Officer Phillips verified Armstead's identification, he learned of a suspect locator hit, which indicated that a DNA sample needed to be obtained, and that a police detective (Detective Seiter) needed to speak with Armstead. *Id.* at pp. 8-9. Phillips told Armstead that a detective needed to talk with him, removed him from the car, and patted him down for officer safety. *Id.* at pp. 10-12, 14, and 16-17. Nothing illegal was found. *Id.* at p. 16. Officer Phillips placed Armstead in the back of the police car for officer safety. Armstead was not handcuffed at any time and was never told by the officers that he was under arrest. *Id.* at p. 13.

**{¶ 35}** Officer Phillips then telephoned Detective Seiter to ensure that the suspect locator hit was still valid, and learned that it was valid. At this time, the driver of the car fled the scene. *Id.* at p. 12. The police officers subsequently transported Armstead to a police facility interview room. *Id.* at p. 13.

**{¶ 36}** The offense being alleged in the present case is a fifth degree felony, based on Armstead's failure to stop after an accident where the accident resulted in serious harm or death to a person in violation of R.C. 4549.02(A). This is the same incident that

Detective Seiter was investigating in 2012. The police did not find Armstead at the scene of that crime. However, the vehicle that was involved contained mail addressed to Armstead. Transcript of Proceedings, p. 22. Credit cards and other cards linked to Armstead were also found in the vehicle. *Id.* at pp. 22-23. In addition, the police received an anonymous "Crime Stoppers" tip, which indicated that Armstead was the driver of the vehicle involved in the hit-and-run. *Id.* at p. 22.

{¶ 37} Although the police made a number of trips to the address listed on the mail that was in the vehicle, they were not able to speak with Armstead. *Id.* at p. 23. Prior to the time that Armstead was picked up on January 13, 2014, Seiter did not procure an arrest warrant. *Id.* at p. 30. However, Seiter had a search warrant for Armstead's DNA pre-typed and pre-reviewed by the City Prosecutor. The warrant was on standby because Seiter had entered a suspect locator. If the warrant had been signed by a judge, Seiter would have had to serve it within three days, and he had not been able to locate Armstead. *Id.* at p. 29. When Seiter was notified that Phillips was bringing Armstead in for an interview, he went to a judge and had a DNA search warrant signed. *Id.* at pp. 29-30.

{¶ 38} The trial court found that Officer Phillips unlawfully detained Armstead, and that Armstead did not voluntarily go to the police station, where he subsequently gave a statement. This finding was based on the fact that a reasonable person in Armstead's circumstances would not have believed he was free to leave when he was transported to the police station. Because the factual findings relating to lack of consent are supported by sufficient credible evidence, they may not be disturbed.[2]

---

[2] Although Armstead was never told that he was under arrest, I agree that the police

**{¶ 39}** Nonetheless, the trial court erred when it suppressed Armstead's statements for the following reasons: lack of exigent circumstances and lack of an arrest warrant. These are the only issues before our court, because the trial court did not suppress the statement for any other reasons.

**{¶ 40}** "A warrantless arrest that is based upon probable cause and occurs in a public place does not violate the Fourth Amendment." *State v. Brown*, 115 Ohio St.3d 55, 2007-Ohio-4837, 873 N.E.2d 858, ¶ 66, citing *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). "A reasonably prudent person must, at the time of arrest, believe that the person placed under arrest was committing or had committed a criminal offense." (Citation omitted.) *Id.* "The existence of probable cause is determined by looking at the totality of the circumstances." *State v. Brown*, 2d Dist. Montgomery No. 26219, 2015-Ohio-1163, ¶ 12, citing *Illinois v. Gates*, 462 U.S. 213, 230–232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

**{¶ 41}** In the case before us, the trial court concluded that Detective Seiter had probable cause in 2012 to believe Armstead had committed the felony offense. I agree with the trial court's conclusion.

**{¶ 42}** The majority opinion disagrees with the trial court's conclusion on this point, and finds the existence of probable cause in 2012 irrelevant, because Officer Phillips only knew that a DNA swab was needed and did not know anything about the alleged crime. *See* ¶ 26 of the majority opinion. This conclusion is incorrect, however, because it fails

---

actions in this case constituted the functional equivalent of a formal arrest, since Armstead was deprived of his freedom of action in a significant way. *See, e.g., State v. Petitjean*, 140 Ohio App.3d 517, 523, 748 N.E.2d 133 (2d Dist.2000). Thus, for purposes of this case, it matters not whether we refer to the situation as "detention" or an "arrest."

to consider the established concept that probable cause to arrest may be based on the collective knowledge of the police. *See State v. Jones*, 2d Dist. Montgomery No. 23926, 2011-Ohio-1984, ¶ 20, quoting *State v. Wortham*, 145 Ohio App.3d 126, 130, 761 N.E.2d 1151 (2d Dist.2001) (" 'police officers are entitled to rely on information received from other police officers' when determining whether reasonable suspicion exists to detain a suspect."). *See also State v. Sellers*, 2d Dist. Montgomery No. 26121, 2014-Ohio-5366, ¶ 19 ("whether probable cause exists must be determined by examining the collective knowledge of the police.")

{¶ 43} In *Wortham*, we noted that:

If an officer detains an individual suspected of criminal behavior in reliance on information received from a fellow officer, who has a reasonable suspicion to make a stop, he need not have independent grounds for suspecting criminal activity but may rely on the information given via the dispatch. However, the state must show that the officer who provided the information had a valid reasonable suspicion of criminal activity.

*Wortham* at 130, citing *Maumee v. Weisner*, 87 Ohio St.3d 295, 298, 720 N.E.2d 507 (1999).

{¶ 44} In the present case, Officer Phillips and Detective Seiter were working in concert. An arrest warrant was not required to lawfully detain Armstead because the officers collectively were aware of facts supporting probable cause to arrest for a felony offense, and the arrest was made in a public place.

{¶ 45} Furthermore, the majority incorrectly relies on the fact that Officer Phillips testified that he did not have probable cause to arrest Armstead. Majority Opinion at

¶ 26.   Whether either officer subjectively believed he had probable cause to arrest is irrelevant, because "a probable cause determination must be viewed under an objective standard, not a subjective standard."   (Citation omitted.)   *State v. McDonald*, 4th Dist. Washington No. 04CA7, 2004-Ohio-5395, ¶ 25.   "The fact that the officer did not believe he had sufficient grounds to stop appellant makes no difference, because in reviewing the totality of the circumstances to determine whether reasonable suspicion exists, we must view the circumstances through the eyes of a reasonable and prudent police officer on the scene.   Again, the standard is objective, the officer's own subjective belief or conclusion regarding the existence of reasonable suspicion is not relevant."   *State v. McCandlish*, 10th Dist. Franklin No. 11AP-913, 2012-Ohio-3765, ¶ 9.   *See also State v. Hansard*, 4th Dist. Scioto No. 07CA3177, 2008-Ohio-3349, ¶ 36   ("a court is not bound by an officer's subjective conclusions concerning the existence of probable cause and may determine that an officer possessed probable cause even if the officer did not believe that the probable cause standard had been satisfied * * *.")

{¶ 46} Thus, trial courts must conduct an objective evaluation whether probable cause exists from the collective knowledge of all officers who are working in conjunction on the investigation, and the knowledge of each officer is imputed to all.   In the case before us, a reasonable and prudent officer on the scene would have had a valid, reasonable suspicion of criminal activity on Armstead's part, and there was probable cause for an arrest.   Accordingly, the majority incorrectly concludes that Armstead's arrest was not based on probable cause.

B.   The Arrest and Exigent Circumstances

**{¶ 47}** Despite the existence of probable cause, the trial court concluded that Armstead's arrest was unlawful because the arrest failed to comply with a second condition. Specifically, the trial court held that even if probable cause exists, an arrest must also be based on exigent circumstances. March 26, 2015 Decision and Entry, p. 6. For this proposition, the court relied on our prior decision in *State v. Jones*, 183 Ohio App.3d 839, 2009-Ohio-4606, 919 N.E.2d 252, ¶ 12 (2d Dist.), which in turn, relied on *State v. Heston*, 29 Ohio St.2d 152, 280 N.E.2d 376 (1972), and *State v. Woodards*, 6 Ohio St.2d 14, 215 N.E.2d 568 (1966). *Id*. at p. 6, fn. 11. In particular, the trial court stressed that the police had probable cause to obtain an arrest warrant for Armstead in December 2012, and should have done so at that time. *Id*. at p. 7. Likewise, the majority opinion focuses on exigent circumstances. Majority Opinion at ¶ 21.

**{¶ 48}** I do not agree that the police must demonstrate exigent circumstances in addition to probable cause. In my opinion, *Jones* incorrectly relies on authority that has been discredited by a subsequent decision of the Supreme Court of the United States, and also imposes an unnecessary burden on the State.

**{¶ 49}** We held in *Jones* that:

A warrantless arrest is permitted when two requirements have been met: first, the officer must have probable cause for the arrest; second, obtaining an arrest warrant beforehand must be shown to have been impracticable under the circumstances.

*Jones* at ¶ 12, citing *Heston* and *Woodards*. We also stated in *Jones* that "[i]n the absence of exigent circumstances, judicially untested determinations by police officers are simply not reliable enough to justify an arrest without a warrant – at least where the

officers had sufficient opportunity to seek one beforehand." (Citation omitted.) *Id.* at ¶ 25.

**{¶ 50}** In *Heston*, the Supreme Court of Ohio held that "[a]n arrest without a warrant is valid where the arresting officer has probable cause to believe that a felony was committed by defendant and the circumstances are such as to make it impracticable to secure a warrant." *Heston* at paragraph two of the syllabus. *Woodards* held to the same effect. *Woodards* at 20.

**{¶ 51}** However, both of these cases were decided prior to *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). In *Watson*, the United States Supreme Court held that failure to obtain a warrant to make an arrest in a public place, absent exigent circumstances, does not violate the Fourth Amendment if the arrest is supported by probable cause. *Id.* at 414-15 and 423.[3]

**{¶ 52}** In *Watson*, the Supreme Court considered whether a defendant's arrest was invalid "because the postal inspector had failed to secure an arrest warrant although he concededly had time to do so." *Id.* at 414. The court concluded that the arrest was not invalid because "Title 18 U.S.C. § 3061(a)(3) expressly empowers the Board of Governors of the Postal Service to authorize Postal Service officers and employees 'performing duties related to the inspection of postal matters' to 'make arrests without warrant for felonies cognizable under the laws of the United States if they have reasonable grounds to believe that the person to be arrested has committed or is

---

[3] I note that *Heston* has not been cited by the Supreme Court of Ohio since it was issued in 1972. In addition, the court has never cited *Woodards* for the proposition that securing a warrant must be impracticable, other than when *Woodards* was cited in *Heston*. *See Heston*, 29 Ohio St.2d at 155, 280 N.E.2d 376.

committing such a felony.' " *Id.* at 415. Because such regulations, with identical language, had been adopted, and because probable cause existed to believe the defendant had violated a federal statute prohibiting mail theft, the court held that the postal inspector and his subordinates were acting strictly in accordance with the governing statute and regulations. *Id.* at 414-415.

{¶ 53} In discussing this issue, the court noted first that other federal officials had been statutorily empowered to make felony arrests based on probable cause without a warrant. *Id.* at 416. The court then stressed that this was consistent with existing Fourth Amendment cases. In this regard, the court observed that:

"The usual rule is that a police officer may arrest without warrant one believed by the officer upon reasonable cause to have been guilty of a felony . . . ." *Carroll v. United States*, 267 U.S. 132, 156, 45 S.Ct. 280, 286, 69 L.Ed. 543 (1925). In *Henry v. United States*, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959), the Court dealt with an FBI agent's warrantless arrest under 18 U.S.C. § 3052, which authorizes a warrantless arrest where there are reasonable grounds to believe that the person to be arrested has committed a felony. The Court declared that "(t)he statute states the constitutional standard . . . ." *Id.*, at 100, 80 S.Ct., at 170. The necessary inquiry, therefore, was not whether there was a warrant or whether there was time to get one, but whether there was probable cause for the arrest. * * * Just last Term, while recognizing that maximum protection of individual rights could be assured by requiring a magistrate's review of the factual justification prior to any arrest, we stated that "such a requirement would

constitute an intolerable handicap for legitimate law enforcement" and noted that the Court "has never invalidated an arrest supported by probable cause solely because the officers failed to secure a warrant."  *Gerstein v. Pugh*, 420 U.S. 103, 113, 95 S.Ct. 854, 862, 43 L.Ed.2d 54 (1975)

(Footnote omitted.)  *Watson*, 423 U.S. at 417-18, 96 S.Ct. 820, 46 L.Ed.2d 598.

**{¶ 54}** The Supreme Court went on to stress that:

The cases construing the Fourth Amendment thus reflect the ancient common-law rule that a peace officer was permitted to arrest without a warrant for a misdemeanor or felony committed in his presence as well as for a felony not committed in his presence if there was reasonable ground for making the arrest.

* * *

The balance struck by the common law in generally authorizing felony arrests on probable cause, but without a warrant, has survived substantially intact.  It appears in almost all of the States in the form of express statutory authorization.  In 1963, the American Law Institute undertook the task of formulating a model statute governing police powers and practice in criminal law enforcement and related aspects of pretrial procedure.  In 1975, after years of discussion, A Model Code of Pre-arraignment Procedure was proposed.  Among its provisions was § 120.1 which authorizes an officer to take a person into custody if the officer has reasonable cause to believe that the person to be arrested has committed a felony, or has committed a misdemeanor or petty misdemeanor in his

presence. The commentary to this section said: "The Code thus adopts the traditional and almost universal standard for arrest without a warrant." (Citations and footnote omitted.) *Watson*, 423 U.S. at 419-422, 96 S.Ct. 820, 46 L.Ed.2d 598.

**{¶ 55}** The court then stated that:

This is the rule Congress has long directed its principal law enforcement officers to follow. *Congress has plainly decided against conditioning warrantless arrest power on proof of exigent circumstances. Law enforcement officers may find it wise to seek arrest warrants where practicable to do so, and their judgments about probable cause may be more readily accepted where backed by a warrant issued by a magistrate. But we decline to transform this judicial preference into a constitutional rule when the judgment of the Nation and Congress has for so long been to authorize warrantless public arrests on probable cause rather than to encumber criminal prosecutions with endless litigation with respect to the existence of exigent circumstances*, *whether it was practicable to get a warrant*, whether the suspect was about to flee, and the like.

(Emphasis added.) *Id.* at 423. The Supreme Court, therefore, concluded that the warrantless arrest did not violate the Fourth Amendment. *Id.* at 424.

**{¶ 56}** Like the federal government, Ohio has a statute permitting warrantless arrests upon probable cause. R.C. 2935.04 allows for suspects to be detained until a warrant can be obtained, stating that:

When a felony has been committed, or there is reasonable ground

to believe that a felony has been committed, any person without a warrant may arrest another whom he has reasonable cause to believe is guilty of the offense, and detain him until a warrant can be obtained.

**{¶ 57}** Some states have acknowledged *Watson's* rule, but have concluded that the constitution of their state provides greater protection than the Fourth Amendment. *See State v. Paananen*, 2015-NMSC-031, 357 P.3d 958, ¶ 22. In *Paananen*, the Supreme Court of New Mexico noted that while *Watson* is still good law, the constitution of New Mexico affords greater protection than the Fourth Amendment. *Id*. at ¶ 18 – 23.

**{¶ 58}** In *Paananen*, the court discussed its prior decision in *Campos v. State,* 117 N.M. 155, 1994-NMSC-012, 870 P.2d 117, which had "held that under our New Mexico Constitution a felony arrest must be preceded by an arrest warrant, even when supported by probable cause, unless exigent circumstances made securing a warrant impractical." *Id.* at ¶ 1. *Paananen* observed that "the crucial 'inquiry in reviewing warrantless arrests [is] whether it was reasonable for the officer not to procure an arrest warrant.' " *Id.* at ¶ 23, quoting *Campos* at ¶ 15.

**{¶ 59}** Further commenting on its prior opinion, the Supreme Court of New Mexico observed that in *Campos*, "[t]he Court appears to have been strongly influenced by the factor of time. Given the early presence of probable cause and adequate opportunity to obtain a warrant prior to the arrest, the officers had no good reason not to get the warrant." *Id.* This is similar to our observation in *Jones* that officers had "ample opportunity and time to obtain an arrest warrant but failed to do so." *Jones*, 183 Ohio App.3d 839, 2009-Ohio-4606, 919 N.E.2d 252, at ¶ 27.

**{¶ 60}** However, unlike New Mexico, Ohio has held that "[t]he language of Article

I, Section 14 of the Ohio Constitution is virtually identical to the language in the Fourth Amendment, and we have interpreted Article I, Section 14 as affording the same protection as the Fourth Amendment." *State v. Hoffman,* 141 Ohio St.3d 428, 2014-Ohio-4795, 25 N.E.3d 993, ¶ 11. *See also State v. Emerson*, 134 Ohio St.3d 191, 2012-Ohio-5047, 981 N.E.2d 787, ¶ 15 (interpreting Article I, Section 14 " 'to protect the same interests and in a manner consistent with the Fourth Amendment.' ") (Citation omitted.)

{¶ 61} Consistent with *Watson* and the Fourth Amendment to the United States Constitution, the Supreme Court of Ohio has held, in interpreting R.C. 2935.04, that:

> A warrantless arrest that is based upon probable cause and occurs in a public place does not violate the Fourth Amendment. *United States v. Watson* (1976), 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598. Warrantless arrests for felony offenses are explicitly permitted in Ohio: R.C. 2935.04 allows for a suspect to be detained until a warrant can be obtained.

*State v. Brown*, 115 Ohio St. 3d 55, 2007-Ohio-4837, 873 N.E.2d 858, ¶ 66.

{¶ 62} Based on *Watson* and *Brown*, I conclude that an "exigent circumstances" or undue delay requirement cannot be imposed on warrantless arrests made with probable cause, and that the trial court erred in relying on such a requirement.

{¶ 63} I do note that the Supreme Court of Ohio has held that "Article I, Section 14 of the Ohio Constitution affords greater protection than the Fourth Amendment against searches and seizures conducted by members of law enforcement who lack authority to make an arrest." *State v. Brown,* 143 Ohio St.3d 444, 2015-Ohio-2438, 39 N.E.3d 496, ¶ 23. To date, this "greater protection" has not been extended beyond situations where officers make warrantless arrests for minor misdemeanors outside their jurisdiction,

contrary to a state statute forbidding such arrests, *id.* at ¶ 26, or situations involving warrantless arrests for minor misdemeanors, where exceptions to R.C. 2935.26 do not apply. *See State v. Brown*, 99 Ohio St.3d 323, 2003-Ohio-3931, 792 N.E.2d 175, syllabus ("Section 14, Article I of the Ohio Constitution provides greater protection than the Fourth Amendment to the United States Constitution against warrantless arrests for minor misdemeanors.")[4]

{¶ 64} In *Brown I*, the court focused on distinguishing the United States Supreme Court decision in *Atwater v. Lago Vista*, 532 U.S. 318, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001), which had held that " 'If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender.' " *Brown I* at ¶ 3, quoting *Atwater* at 354.

{¶ 65} Before *Atwater* was decided, the Supreme Court of Ohio had unanimously concluded that full custodial arrests for minor misdemeanors were unreasonable under the Fourth Amendment, if no exception in R.C. 2935.26 applied. *State v. Jones*, 88 Ohio St.3d 430, 727 N.E.2d 886 (2000), syllabus, *followed in part and modified in part, Brown I* at syllabus and ¶ 22.

{¶ 66} The *Jones* decision was based on a traditional Fourteenth Amendment balancing test. In this regard, the court concluded in *Jones* that the serious intrusion into personal privacy and liberty outweighed the state's minimal "interests in making a full custodial arrest for a minor misdemeanor offense, absent any R.C. 2935.26 exceptions *

---

[4] For purposes of clarity, I will refer to the 2003 case as "*Brown I*," and the 2015 case as "*Brown II*," since both cases bear the same party names.

* *." *Jones* at 440. *Atwater*, of course, concluded otherwise.

{¶ 67} Subsequently, in *Brown I*, the Supreme Court of Ohio stated that:

Appellant contends that *Atwater* undermines our holding in *Jones*, particularly because in *Jones* we acknowledged our prior determination that the protections provided by Section 14, Article I of the Ohio Constitution are coextensive with those provided by the Fourth Amendment. We conclude that, to the extent that *Jones* relies on the Fourth Amendment to the United States Constitution, it is no longer authoritative regarding warrantless arrests for minor misdemeanors. The Ohio Constitution, however, "is a document of independent force. In the areas of individual rights and civil liberties, the United States Constitution, where applicable to the states, provides a floor below which state court decisions may not fall. As long as state courts provide at least as much protection as the United States Supreme Court has provided in its interpretation of the federal Bill of Rights, state courts are unrestricted in according greater civil liberties and protections to individuals and groups. * * *

We must now determine whether Section 14, Article I of the Ohio Constitution provides greater protection than the Fourth Amendment. In *State v. Robinette* (1997), 80 Ohio St.3d 234, 239, 685 N.E.2d 762, we stated that "we should harmonize our interpretation of Section 14, Article I of the Ohio Constitution with the Fourth Amendment, unless there are persuasive reasons to find otherwise." We find that the balancing test set forth in *Jones* provides ample reason for holding that Section 14, Article I of

the Ohio Constitution provides greater protection than the Fourth Amendment to the United States Constitution against warrantless arrests for minor misdemeanors. Thus, *Jones* is still authoritative as to the Ohio Constitution.

*Brown I*, 99 Ohio St.3d 323, 2003-Ohio-3931, 792 N.E.2d 175, at ¶ 21-22.

**{¶ 68}** Citing a decision of the Montana Supreme Court, the Supreme Court of Ohio then held that police officers may not reasonably arrest and detain individuals for minor misdemeanor offenses when none of the circumstances in R.C. 2935.26 apply. The court thus held that the defendant's arrest violated Section 14, Article I of the Ohio Constitution and the evidence discovered as a result of the search must be suppressed. *Id.* at ¶ 23-25, citing *State v. Bauer*, 307 Mont. 105, 36 P.3d 892 (2001).

**{¶ 69}** As was noted, in *Brown II*, the Supreme Court of Ohio also extended this "greater protection" to traffic stops for minor misdemeanor offenses where an officer does not have statutory authority to make the stop. *Brown II,* 143 Ohio St.3d 444, 2015-Ohio-2438, 39 N.E.3d 496, at ¶ 23-26. The extension in *Brown II* was based on a doctrine rooted in common law, and later codified in Ohio statutes, which indicated that "officers making an extraterritorial arrest acted outside their official capacity and were therefore treated as private citizens." *Id.* at ¶ 12.

**{¶ 70}** Despite these two limited extensions, the Supreme Court of Ohio has stressed that "[w]e must be cautious and conservative when we are asked to expand constitutional rights under the Ohio Constitution, particularly when the provision in the Ohio Constitution is akin to a provision in the U.S. Constitution that has been reasonably interpreted by the Supreme Court." (Citation omitted.) *State v. Gardner*, 118 Ohio St.3d

420, 2008-Ohio-2787, 889 N.E.2d 995, ¶ 76.

**{¶ 71}** To the same effect is S*tate v. Smith*, 124 Ohio St.3d 163, 2009-Ohio-6426, 920 N.E.2d 949, which emphasized that Section 14, Article I of the Ohio Constitution is "virtually identical to the language of the Fourth Amendment." *Id.* at ¶ 10, fn.1. In *Smith*, the court specifically noted that Ohio's constitution affords the same protection in felony cases as the Fourth Amendment. *Id.* The court also observed that *Brown I* extended greater protection for warrantless arrests involving minor misdemeanors. *Id. See also State v. Neely*, 2d Dist. Montgomery No. 24317, 2012-Ohio-212, ¶ 21 (noting that "[w]ith rare exceptions, the protection afforded under the Ohio Constitution against unreasonable searches and seizures is coextensive with the protection afforded under the United States Constitution"), and *State v. McLemore*, 2d Dist. Montgomery No. 24211, 2011-Ohio-1980, ¶ 7 (declining to extend the greater protection outlined in *Brown I* to a misdemeanor case, because the Supreme Court of Ohio "has not extended this rationale to all misdemeanors * * *.")

**{¶ 72}** The situation in the case before us, which pertains to a felony, does not involve one of the rare exceptions that provides greater protection under Ohio's constitution. Instead, we are bound by the decisions in *Watson*, 423 U.S. at 414-15, 96 S.Ct. 820, 46 L.Ed.2d 598, and *Brown*, 115 Ohio St. 3d 55, 2007-Ohio-4837, 873 N.E.2d 858, at ¶ 66, which indicate that warrantless arrests based on probable cause and occurring in public places do not violate the Fourth Amendment, even in the absence of exigent circumstances.

**{¶ 73}** Many opinions of this court have acknowledged and followed *Watson* and/or *Brown*. For example, in *State v. Piggott*, 2d Dist. Montgomery No. 18962, 2002-Ohio-

3810, we held that:

> "The necessary inquiry, therefore, [is] not whether there was a warrant or whether there was time to get one, but whether there was probable cause for the arrest. *Watson*, *supra*, 423 U.S. at 417 [, 96 S.Ct. 820, 46 L.Ed.2d 598]. If probable cause exists, an arresting officer is not required to obtain a warrant in order to apprehend a suspected felon in a public place."

*Id.* at ¶ 25, quoting a September 28, 2000 Trial Court Decision in the same case. *Accord State v. Hensley*, 2d Dist. Montgomery No. 82-CR-2345, 1985 WL 7883, *2 (Apr. 2, 1985); *State v. Morgan*, 2d Dist. Montgomery No. 15351, 1996 WL 517266, *6 (Sept. 13, 1996); *State v. Johnson*, 2d Dist. Montgomery No. 17420, 2001 WL 561312, *6 (May 25, 2001); *State v. Wolford*, 2d Dist. Montgomery No. 19009, 2002 WL 360672, *1 (March 8, 2002); *State v. Carter*, 2d Dist. Montgomery No. 21145, 2006-Ohio-2823, ¶ 24; *State v. Barksdale*, 2d Dist. Montgomery No. 21848, 2008-Ohio-182 ¶ 11; *Sellers*, 2d Dist. Montgomery No. 26121, 2014-Ohio-5366, at ¶ 13; and *State v. Brown*, 2d Dist. Montgomery No. 26219, 2015-Ohio-1163, ¶ 12-15.

{¶ 74} As was noted, *Jones* applies a different rule – probable cause plus exigent circumstances – that is inconsistent with rules established by the United States Supreme Court and the Supreme Court of Ohio. *See Jones*, 183 Ohio App.3d 839, 2009-Ohio-4606, 919 N.E.2d 252, at ¶ 25.

{¶ 75} The rule in *Jones* has been applied in a few other cases in our district. *See State v. Anderson*, 2d Dist. Clark Nos. 2009-CA-60, 2009-CA-61, 2011-Ohio-22, ¶ 21 (concluding that seeking a warrant must be impracticable and citing *Jones* at ¶ 12), and *State v. VanNoy*, 188 Ohio App.3d 89, 2010-Ohio-2845, 934 N.E.2d 413, ¶ 23 (2d Dist.)

(stating that "in order for an officer to lawfully perform a warrantless arrest in a public place, the arrest must not only be supported by probable cause, it must also be shown that obtaining an arrest warrant beforehand was impracticable under the circumstances, i.e., that exigent circumstances exist," and citing *Jones* at ¶ 25).

**{¶ 76}** In *State v. Whitt*, 2d Dist. Clark No. 2010 CA 3, 2010-Ohio-5291, we distinguished *VanNoy* and *Jones* because "the officers [in those cases] arrested the defendant without a warrant, based on events that had occurred weeks or months previously.   In contrast, events [in *Whitt*] were continuing to unfold until the time that [the defendant] was arrested."   *Id.* at ¶ 41.

**{¶ 77}** However, the record in *Whitt* indicates that controlled buys of drugs occurred on March 20, April 2, April 7, and April 13, 2009, and the warrantless arrest occurred about one hour after the last controlled buy.   *Id.* at ¶ 5-9.   Any one of these transactions, *which occurred a week or weeks apart*, would have furnished probable cause for a warrant, and there appears to be no reason why the police could not have obtained a warrant.   Notably, the events did not "unfold" in a continuous transaction, since they occurred weeks apart.   They were also not significantly different than the situation in *Jones*, where the police had been using a confidential informant to buy drugs from the defendant for quite some time (a period not disclosed in the opinion), and had been looking for the defendant for about three weeks before his warrantless arrest. *Jones*, 183 Ohio App.3d 839, 2009-Ohio-4606, 919 N.E.2d 252, at ¶ 16-18.

**{¶ 78}** In my opinion, even if the law permitted consideration of exigent circumstances or delay (which it does not), applying such a vague standard would be too difficult and would lead to inconsistent results, as demonstrated by the *Whitt* and *Jones*

decisions. Specifically, how many months or weeks or days (or perhaps even hours) is too long a delay, and what length of time would be sufficiently close to validate a warrantless arrest in a public place?

## C.   Miranda Warnings

{¶ 79} Having concluded that Armstead was properly arrested, I will next address the issue of the administration of *Miranda* warnings.   I agree with the majority that Armstead was in custody for purposes of requiring *Miranda* warnings prior to the interview.   The majority holds that the *Miranda* warnings did not purge the taint of Armstead's unlawful seizure.   Majority Opinion at ¶ 28-29.   Because the arrest was lawful, I disagree with the majority.

{¶ 80} However, even if the arrest had been unlawful, I would still not conclude that Armstead's statements should be suppressed.   Specifically, while in custody, Armstead was properly *Mirandized* and was permitted to speak privately with his attorney. He thereafter chose, voluntarily, to speak with the officers.   Contrary to the conclusion of the majority, the *Miranda* warnings are not the only circumstance to be considered. Instead, Armstead also spoke with an attorney, and on the attorney's advice, decided to speak with the police.   The majority does not discuss this point.

{¶ 81} "In *Wong Sun*, the Court pronounced the principles to be applied where the issue is whether statements and other evidence obtained after an illegal arrest or search should be excluded."   *Brown v. Illinois*, 422 U.S. 590, 597, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), citing *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).   "In order for the causal chain, between the illegal arrest and the statements

made subsequent thereto, to be broken, *Wong Sun* requires not merely that the statement meet the Fifth Amendment standard of voluntariness but that it be 'sufficiently an act of free will to purge the primary taint.' " *Id.* at 602, quoting *Wong Sun*, 371 U.S. at 486.

**{¶ 82}** The Supreme Court further observed in *Brown* that:

It is entirely possible, of course, as the State here argues, that persons arrested illegally frequently may decide to confess, as an act of free will unaffected by the initial illegality. But the *Miranda* warnings, alone and per se, cannot always make the act sufficiently a product of free will to break, for Fourth Amendment purposes, the causal connection between the illegality and the confession. They cannot assure in every case that the Fourth Amendment violation has not been unduly exploited.

While we therefore reject the per se rule which the Illinois courts appear to have accepted, we also decline to adopt any alternative per se or "but for" rule. * * * The question whether a confession is the product of a free will under *Wong Sun* must be answered on the facts of each case. No single fact is dispositive. * * * The *Miranda* warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct are all relevant. The voluntariness of the statement is a threshold requirement. And the burden of showing admissibility rests, of course, on the prosecution.

(Citations omitted.)  *Brown*, 422 U.S. at 603-04, 95 S.Ct. 2254, 45 L.Ed.2d 416.

{¶ 83} Here, *Miranda* warnings were given, but that, alone, while important, is not dispositive.   Furthermore, although not much time had elapsed between when Armstead was seized and his statement was made, he was permitted to speak with his attorney in private, and the police did not limit the duration of the time that he was able to confer.   In *Brown*, Justice Powell indicated that actual consultation with counsel would be a "demonstrably effective break in the chain of events leading from the illegal arrest to the statement * * *."   *Brown* at 611 (Powell, J., concurring in part).

{¶ 84} As an example of such a situation, the Ninth Circuit Court of Appeals concluded in *United States v. Wellins*, 654 F.2d 550 (9th Cir.1981), that an order suppressing the fruits of a consent search and the defendant's subsequent statements to police was clearly erroneous.   *Id.* at 557.   Among the pertinent factors was that the district court failed to give due weight to the fact that the defendant was permitted to consult with his attorney before consenting to the search.   *Id.* at 555.   In this regard, the court of appeals observed that:

> The crucial factor in this case is that Wellins [the defendant] was permitted
> to consult with his attorney.   This is so particularly in light of the totality of
> the circumstances.   *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68
> L.Ed.2d 378 (1981).   Wellins is a licensed commercial pilot who, among
> other things, is rated to fly jet aircraft.   In addition, Wellins is not a juvenile,
> and the record does not reflect that Wellins was in any way emotionally
> unstable at the time he gave his consent.   Rather, the record compels the
> conclusion that Wellins was not only calm and composed, but that he was

disposed to cooperate with the DEA while wanting to give the impression to others that he was not cooperating with the government agents. In sum, Wellins' age, experience, intelligence, emotional state at the time he consented to the search, and the fact that he had been advised of his Miranda rights, while not per se "intervening circumstances", are all relevant considerations with respect to the possible effect of Wellins' consultation with his attorney. Realistically, it is difficult to imagine a set of circumstances which would more clearly require a finding of attenuation absent the passage of a substantial period of time.

*Wellins* at 555-56.

{¶ 85} At the time Armstead was questioned, he was 42 years old. The record indicates that he was coherent when questioned, did not appear to be under the influence of drugs or alcohol, and answered questions appropriately. March 23, 2015 Transcript of Proceedings, p. 26. The police also did not threaten him, did not raise their voices, and did not make any promises; the overall tone was professional. *Id.* at pp. 26-27. After answering a few questions, Armstead stated that was "all he was going to say because that's all his attorney wanted him to say and that was the end of the interview." *Id.* at p. 27. The interview lasted about ten minutes. *Id.* at p. 28.

{¶ 86} Under the circumstances, it is hard to conceive what more could have been done to break the chain of the events between the alleged illegal arrest and Armstead's statements. The absence of "threats or misrepresentations" also "weighs against the defendant." *Wellins*, 654 F.2d at 557. And, even if I assumed the arrest was illegal, the officers' alleged misconduct in this case was not flagrant.

**{¶ 87}** As an additional matter, after being given *Miranda* warnings and after being allowed to talk to his attorney, Armstead stated that he would talk to the police. He then gave several statements before terminating the interview. Whether his statement was voluntary is "a question of fact to be determined from the totality of the circumstances. The basic test for voluntariness is whether the statement is the product of a rational intellect and free will. *Mincey v. Arizona* (1976), 437 U.S. 385, 398, 98 S.Ct. 2408, 57 L.Ed.2d 290." (Citations omitted.) *State v. Stewart*, 2d Dist. Montgomery No. 22759, 2009-Ohio-2184, ¶ 21.

**{¶ 88}** For the reasons expressed, I conclude that even if Armstead had been illegally arrested by the police, his statements should not have been suppressed because they were attenuated from the alleged taint arising from the arrest, and were also voluntary.

**{¶ 89}** Based on the preceding discussion, and for all the grounds stated, I very respectfully dissent.

. . . . . . . . . .

Copies mailed to:

Christina E. Mahy
Tina M. McFall
Hon. Timothy N. O'Connell